STATE OF MAINE&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;SUPERIOR COURT
WALDO, ss.&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;&emsp;DKT. NO. CV-12-41

|  |  |  |
|---|---|---|
| JOHN M. POWELL and KATHLEEN M. POWELL, | ) ) ) |  |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **DECISION AND JUDGMENT** |
| CHARLES DHYSE TRUST, TEMPLE HEIGHTS MAINE LLC, FREDERICK G. DHYSE REVOCABLE TRUST, and ALAN TETERVIN, | ) ) ) ) ) ) | |
| Defendants. | ) | |

A trial on the pending Complaint was held before the Court on January 2 and 3, 2019. Following the trial, the parties filed written Closing Arguments and Reply memoranda for the Court's further consideration.

## PROCEDURAL BACKGROUND

Plaintiffs John and Kathleen Powell filed a Complaint against a number of defendants in 2012 alleging violations of the Maine Uniform Fraudulent Transfer Act, 14 M.R.S. §§ 3571-3582 (2018) ("UFTA"). A default was entered against Charles Dhyse, the person at the center of this controversy, on May 7, 2013. Charles Dhyse thereafter sought to set aside the default, but this Court denied that motion on September 18, 2013. In the same order, the Court deferred ruling on a request for a default judgment made by Plaintiffs. The case proceeded along until it was removed to federal bankruptcy court on June 1, 2015. It remained there through December 29, 2016, when the federal bankruptcy court remanded it back to this Court. Thereafter, on February 22, 2017, the parties stipulated to the dismissal of Charles Dhyse as a defendant. Eventually, the case was set for a bench trial that was held on January 2 and 3, 2019.

Attorney Susan Thiem represented Plaintiffs at trial; attorney Stephen Wade represented

1

Defendants the Charles Dhyse Trust, the Frederick G. Dhyse Revocable Trust, and Temple Heights Maine LLC;[1] attorney Aaron Fethke represented Defendant Alan Tetervin. At the start of trial, the parties stipulated to the admission of Plaintiffs' Exhibits 1-16, 28-44, and 46-49. They further stipulated to the admission of the Trust Defendants' Exhibits 1-16, 19, 44-45, 51-53, and 56. The remainder of the exhibits admitted during the course of the trial are reflected in the recording log. Mark Powell, Ashley Landry, James Nealley, Ronald Recht, Charles Dhyse, and Alan Tetervin were called to testify by Plaintiffs. The Trust Defendants called Edward Collins to testify.

## FACTS

These factual findings are made from the exhibits stipulated for admission, the exhibits admitted without objection, the exhibits admitted over objection, and the testimony of the witnesses that the Court found helpful and credible.

This case involves a number of separate pieces of real estate in Northport, Maine. Plaintiffs seek to have three transfers of interests made by Charles Dhyse in two pieces of real estate declared to be fraudulent transfers. The first piece of real estate at issue in this case was acquired by Charles Dhyse in October 2004 (the "Stowers Property"). The second piece of real estate (the "Boathouse Property") is located along Rt. 1. Charles Dhyse acquired an interest in the Boathouse Property in February 1996. Plaintiffs attack subsequent transfers of these properties due to Charles Dhyse's default on a loan Plaintiffs had made to him (the "Powell Loan") in order to facilitate Charles Dhyse's purchase of other real estate in Northport. The Court will address each of the relevant pieces of property and associated transactions in turn.

1. The Stowers Property.

Charles Dhyse purchased the Stowers Property from Stanley Stowers on October 13, 2004.

---

[1] The Court will refer to these Defendants collectively as the "Trust Defendants" unless it is necessary to refer to one separately.

2

The purchase was financed by Camden National Bank ("CNB"), and CNB took back a mortgage on the Stowers Property in the amount of $157,540. Charles Dhyse soon defaulted on his payments on the loan for the Stowers Property, and CNB obtained a judgment of foreclosure on June 5, 2006. The judgment of foreclosure reflects that Charles Dhyse owed CNB $130,911 at that time. CNB swept Charles Dhyse's personal accounts and recovered approximately $40,000.

Following that, Charles Dhyse attended the foreclosure sale for the Stowers Property in late 2006 and, with his parents' trust's assistance,[2] he was the successful bidder. He attended the foreclosure auction at his parents' request because they were trying to help him out at a time of severe financial difficulty. The reacquisition of the Stowers Property was paid for by the Frederick Trust through its attorneys at the time, Kelly & Associates. The amount paid by Kelly & Associates was $105,000. The Frederick Trust then took back a mortgage on the property for $105,000 to secure that payment to Charles Dhyse to purchase the property.[3] CNB deeded the property to Charles Dhyse on December 5, 2006, and Charles Dhyse executed the aforementioned mortgage in the Frederick Trust's favor on January 19, 2007. Both the deed and the mortgage were recorded in the Waldo County Registry of Deeds on January 29, 2007. Despite reacquiring the Stowers Property from CNB, Charles Dhyse's financial issues persisted.

Shortly after the sale back to Charles Dhyse, CNB obtained and recorded against all real property of Charles Dhyse's the following: (1) an *ex parte* order of attachment; (2) a deficiency order and judgment; and (3) a writ of execution. By the time the writ of execution was issued on

---

[2] Charles Dhyse's parents were Frederick and Suzanne Dhyse. At the times relevant to this case, before their passing in 2008, they were the trustees of the Frederick G. Dhyse Revocable Trust. When referring to this trust separately, the Court will refer to it as the "Frederick Trust."

[3] The total amount paid to CNB—as reflected in its paperwork—was $115,500, which included a $10,500 bid deposit. Charles Dhyse testified that all money for the purchase at the foreclosure sale came from the Frederick Trust. The discrepancy between the final sale price and the amount of the Frederick Trust's mortgage on the Stowers Property was not explained by the evidence at trial.

3

January 19, 2007, the total amount owed to CNB by Charles Dhyse was more than $55,000. Soon thereafter, Edward Collins, a Rockland-area attorney, became the Frederick Trust's attorney.

Upon his hiring, Attorney Collins began investigating title encumbrances on the Stowers Property that might affect the Frederick Trust's mortgage on that property. Collins's investigation revealed a number of duly recorded liens against Charles Dhyse's property, including the Stowers Property. The liens against Charles Dhyse's property included Town of Northport real estate tax liens, State of Maine sales tax liens, the CNB execution lien, and a lien from a local lumber yard (Viking, Inc.). Attorney Collins discussed these vulnerabilities to the Frederick Trust's mortgage on the Stowers Property with Frederick and Suzanne. In those discussions, he laid out two possible paths. First, the Frederick Trust could walk away from its $105,000 mortgage on the Stowers Property. Second, the Frederick Trust could clean up all the liens against Charles Dhyse's property and, in return, Charles would convey the property to an LLC to be formed to own the property. After consultation with Attorney Collins, Frederick and Suzanne chose the latter path.

The Frederick Trust then commenced the plan to clean up the liens. All liens were eventually discharged or released after the Frederick Trust paid the amounts of the liens, and the discharges and releases were recorded with the Waldo County Registry of Deeds. Payment was made to CNB for the mortgage deficiency in the amount of $51,769.91. The Frederick Trust also paid $3,633.24 to the State of Maine for the sales tax liens, $2,217.39 for the Town of Northport real estate tax liens, and $5,705.39 for the Viking, Inc. execution lien.

Then, in accordance with the plan, Attorney Collins formed an LLC for the purpose of holding the Stowers Property once Charles Dhyse transferred it following the satisfaction of the liens. An LLC was formed (Temple Heights Maine LLC) on May 8, 2007, and the membership units of the LLC were set to be wholly owned by Frederick and Suzanne Dhyse as trustees of the

4

Frederick Trust. Thus, in consideration of satisfaction of the $105,000 mortgage and the $63,325.60 paid to clear the liens against Charles Dhyse's property held by his creditors, Charles Dhyse executed a deed for the Stowers Property to Temple Heights Maine LLC.[4,5] At the time Charles Dhyse deeded the property to the LLC, it was encumbered by valid liens totaling more than $168,000.[6] The deed was recorded with the Waldo County Registry of Deeds on May 14, 2007.[7]

Both Frederick and Suzanne Dhyse passed away in 2008. Suzanne passed away on May 8, 2008, and Frederick passed away shortly thereafter on June 25, 2008. Upon their passing, a new trust came into existence. That trust was the Charles Dhyse Trust (CDT). The CDT inherited and now owns the membership interest in Temple Heights Maine LLC. Ronald Recht, an attorney in Maryland and Washington, D.C., is the co-trustee of the CDT with another individual who is an

---

[4] Temple Heights Maine LLC is still the owner of the Stowers Property. The sole purpose of the LLC is to own the Stowers Property.

[5] Though Plaintiffs proclaim otherwise, at the time of the transfers in question, neither the Frederick Trust nor the LLC were "insiders." *See* 14 M.R.S. § 3572(7)(A)(1)-(4) ("If the debtor is an individual[, an insider includes] . . . [a] relative of the debtor or of a general partner of the debtor; . . . [a] partnership in which the debtor is a general partner; . . . [a] general partner in a partnership described in subparagraph (2); or . . . [a] corporation of which the debtor is a director, officer or person in control . . . .").

[6] Attorney Collins did not know if Charles Dhyse had ever paid taxes on this exchange which relieved Dhyse of over $168,000 in debt. Attorney Collins also did not know if a 1099 form was ever issued to Dhyse as part of this exchange.

[7] There is no evidence that the $105,000 mortgage was ever discharged. Attorney Collins testified that he never filed a discharge of the mortgage because he believed the mortgage merged out of existence when the Frederick Trust, whose name the mortgage was in, obtained title to the Stowers Property by way of owning all of the membership units of the LLC. *See, e.g., Wyman v. Porter*, 108 Me. 110, 120, 79 A. 371, 375 (1911) ("A merger takes place only when the whole title equitable as well as legal unites in the same person."). The Court does not find it necessary to the decision in this case to conclude one way or the other.

5

accountant. [8, 9] Since Temple Heights Maine LLC became the owner of the Stowers Property it has paid approximately $2,100 per year in real estate taxes and liability insurance. There is some evidence of work being done on the property in the early part of the 2010s, but Attorney Recht was not aware of any work being done in the past several years. The Stowers Property was listed for sale in 2012 for $95,000, with that price being at the recommendation of the listing broker. However, it received no interest from any buyers and was taken off the market when this lawsuit was commenced.

### 2. The Boathouse Property.

In 1996, Charles Dhyse decided he wanted to operate a boat business and he identified a location on Rt. 1 in Northport. He had known Alan Tetervin[10] since the 1980s, and Charles Dhyse convinced Tetervin to purchase the location for Dhyse to run the boat business. Tetervin agreed to purchase the property for Dhyse to run his boat business.[11] As part of the purchase, the Boathouse Property was deeded to Tetervin and Dhyse as tenants in common. Because Tetervin was putting up all the money for the purchase, Tetervin and Dhyse entered into a co-tenancy

---

[8] Attorney Recht was an attorney for Frederick and Suzanne until their passing in 2008. As stated above, he is now a trustee of the CDT, which now owns the membership interest in the LLC.

[9] Among other findings that apply with equal weight here due to the principles of collateral estoppel, the Court found in its February 21, 2018 Order Regarding Defendants' Motion *in Limine* the following: the CDT was created automatically upon the passing of both Suzanne and Frederick; Charles Dhyse did not have legal control over trust assets and has not been able to do anything other than call Mr. Recht and ask that certain bills be paid; the CDT is a valid existing funded trust under Maryland law; the CDT has a spendthrift provision, valid and enforceable under Maryland law; and, the spendthrift provision of the CDT and the discretionary distribution provision prohibit the Powells, the Chapter 13 bankruptcy trustee, and other creditors of Charles Dhyse from reaching assets of the CDT.

[10] Alan Tetervin has never lived in Maine before.

[11] There was evidence of three parcels of property on Rt. 1 being purchased, but Tetervin could only recall purchasing two.

6

agreement in 1996 that dictated the terms of the relationship regarding the property.[12] The co-tenancy agreement called for Tetervin to put up all the money for the purchase. In the event the property was sold, Tetervin would get his money back first (assuming it was sold for a profit). The agreement required Dhyse to operate his business and to pay the taxes on the property. If Dhyse were to fail in his obligations, title to the Boathouse Property was to revert fully to Tetervin.

Dhyse paid real estate taxes for several years, but Tetervin has been consistently making the tax payments on the property since approximately 2006.[13] Tetervin never worked at the Boathouse business and he never received any funds from any sales for Dhyse's Boathouse business. On March 27, 2009, Dhyse executed a quitclaim deed for the Boathouse Property releasing all of his interest in the property.[14] The deed was recorded in the Waldo County Registry of Deeds on April 1, 2009.

### 3. The Powells' Loan and Foreclosure Judgment.

Plaintiff John "Mark" Powell, from Richmond, Virginia, is in the real estate business. He makes loans to assist individuals with purchasing properties, and he has been doing so for approximately twenty-five years. Powell met Charles Dhyse in 2004. In the late summer of 2004, the Powells agreed to loan Dhyse money in order to facilitate Dhyse's purchase of some real estate

---

[12] At trial, Alan Tetervin's counsel attempted to have a copy of the co-tenancy agreement admitted into evidence. The Court did not admit it because it had surfaced shortly before trial. However, before Tetervin's counsel attempted to have the agreement admitted, Tetervin testified to his understanding of the agreement. The Court found his testimony regarding the details of the agreement to be credible, and it finds as fact that the co-tenancy agreement was valid.

[13] According to Dhyse, the Boathouse was a successful business until the moment of the CNB foreclosure on the Stowers Property, and the Boathouse as a business was thereafter fully inoperative by 2006.

[14] Charles Dhyse testified that he last worked at the Boathouse in 2005, though he has sold boats since 2005. There was some evidence at trial of Charles Dhyse being present at the Boathouse Property after this time and of him storing at least one boat at the property. However, there was not clear and convincing evidence that he retained actual control or possession of the property from that point onward. He testified to storing some boats at the Boathouse that he sold individually after he ceased operating the business, but there are none stored there now.

7

in Northport. The loan amount was for $180,000 over 12 months plus 10% interest unless renewed. Dhyse was given the option to renew after 12 months for $7,200 with the interest increasing to 12%.[15] Dhyse signed a promissory note and, in exchange for the loan, the Powells took back a mortgage on the property Dhyse was purchasing in addition to a separate parcel in Northport that Dhyse owned.[16] The Powells soon ran into collection issues with Dhyse.

On August 17, 2006, Mark Powell sent Charles Dhyse a letter notifying Dhyse that he was in default of his obligations on the loan.[17] Eventually, after Mark Powell could no longer get in contact with Dhyse, the Powells filed a complaint for foreclosure on April 23, 2008. The Powells obtained a judgment of foreclosure on August 26, 2008, in the amount of $276,057. At the foreclosure sale, the Powells purchased the property and executed a quitclaim deed to themselves. They filed a report of sale with the court on February 26, 2009. They further moved for a deficiency judgment, but it was denied because the Powells were the successful bidders at the foreclosure sale and did not offer an independent appraisal as required by 14 M.R.S. § 6324 (2018). The Powells never appealed this denial of a deficiency judgment and never filed an independent appraisal.

Instead of ultimately obtaining a deficiency judgment in the foreclosure action, the Powells

---

[15] Charles Dhyse renewed once.

[16] These properties which were subject to the mortgage held by the Powells were different from any of the parcels described as the Stowers Property or the Boathouse Property.

[17] Apparently, this was not the default that prompted the eventual foreclosure action because there is evidence in the record that Charles Dhyse paid the $7,200 renewal fee after the date of this first letter. There is further evidence in the record that communications regarding the debt may have continued into early 2008. What exact payments were made when (following the August 2006 letter) is not clear. It is also not clear from the record exactly when Dhyse was truly in default for purposes of Plaintiffs bringing a foreclosure action. The next known date is the filing of the April 23, 2008 foreclosure complaint.

filed a separate action seeking to collect on the promissory note.[18] This action was filed on May 21, 2009. Charles Dhyse was served by publication and eventually defaulted. The court entered judgment for the Powells on the promissory note on August 29, 2009. Charles Dhyse attempted to set aside the default but was denied.[19]

## DISCUSSION

First, as an initial matter, Plaintiffs contend that Charles Dhyse's earlier default in this case caused the allegations in Plaintiffs' Complaint to be deemed true and become findings of fact, citing *Haskell v. Bragg*, 2017 ME 154, 167 A.3d 1246, therefore binding all other defendants in this case to the facts as alleged. The Trust Defendants incisively point out that *Haskell* does not stand for that expansive proposition; *Haskell* merely stands for the proposition that "[t]he entry of default establishes *the defaulting party's liability* as set forth in the complaint and precludes *that party* from litigating any of the elements of liability related to the claim." *Id.* ¶ 14 (emphases added). Charles Dhyse would be precluded from litigating his liability. However, Charles Dhyse was dismissed as a defendant in this action in 2017. The Trust Defendants and Alan Tetervin did not default and certainly can contest their liability on Plaintiff's Complaint.

Second, the Trust Defendants challenged Plaintiffs' status as "creditors" with a "claim" owed a "debt," as those terms are defined under the UFTA. Fundamentally, the UFTA is meant to remedy fraudulent transfers made to avoid "creditors" with a "claim." The Trust Defendants' position reads the definitions of "debt" and "claim" too narrowly. A "claim" under the UFTA

---

[18] None of the present defendants—the Charles Dhyse Trust, the Frederick G. Dhyse Revocable Trust, Temple Heights Maine LLC, or Alan Tetervin—were parties to the Powells' action on the promissory note.

[19] The Trust Defendants moved for judgment as a matter of law both at the end of the Plaintiffs' case and after all the evidence was presented. *See* M.R. Civ. P. 50(d). That challenge was based, in part, on whether the Plaintiffs had a valid debt owed to them due to the failure to obtain a deficiency judgment in the foreclosure proceeding. The Court deems this motion moot due to its decision in this case.

"means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 14 M.R.S. § 3572(3). This definition of "claim" is expansive and should be read broadly. The Trust Defendants' argument that there is no "debt" because the Plaintiffs failed to properly obtain a deficiency judgment as part of the original foreclosure proceeding too narrowly limits the applicability of the UFTA. Undoubtedly, the Plaintiffs loaned Charles Dhyse money and were never paid back all that they were owed. Such a circumstance fits within the definition of a "claim." The question is whether the other statutory elements are met in this case.

1.  The Maine Uniform Fraudulent Transfer Act.

As the name of the statute suggests, the UFTA is meant to address fraudulent transfers. There are two different sections in the UFTA that make transfers fraudulent for varying reasons. The first defines transfers that are fraudulent as to present and future creditors. 14 M.R.S. § 3575. A transferor violates that section if the debtor made the transfer "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor," *id.* § 3575(1)(A), or if the transfer was not for "reasonably equivalent value," *id.* § 3575(1)(B). The statute then provides examples of particular circumstances that could demonstrate "actual intent." *Id.* § 3575(2). The next section of the statute defines transfers that are fraudulent as to present creditors for debts that arose before the transfer was made. A transfer is fraudulent pursuant to that section if the transfer is made without the receipt of reasonably equivalent value, *id.* § 3576(1), or is a preferential transfer to an insider, *id.* § 3576(2).[20] A litigant seeking to prove that a transfer was fraudulent must do so by clear and

[20] Plaintiffs' Complaint does not expressly state which section they are relying on to prove a fraudulent transfer. In their post-trial briefing, Plaintiffs cite only to section 3575 as a basis for finding the transfers to be fraudulent. The arguments regarding Charles Dhyse's transfer of the Stowers Property to the LLC and his transfer of his one-half interest in the Boathouse Property to Alan Tetervin reference evidence that would go to the factors in section 3575(2) that can be evidence of actual intent in section 3575(1)(A). Plaintiffs cite expressly to section 3575(1)(B)(2) regarding Charles Dhyse's grant of a mortgage to the

10

convincing evidence. *Morin v. Dubois*, 1998 ME 160, ¶ 3, 713 A.2d 956. "Whether a conveyance is fraudulent under the [UFTA] is a question of fact, and we will not overturn the trial court's findings of fact unless they are clearly erroneous." *Id.*

In this case, there are two definitions from the statute that are of particular importance in rendering the judgment on one transfer. The first is the definition of an "asset," which means "property of a debtor, but does not include . . . [p]roperty to the extent that it is encumbered by a valid lien; or . . . [p]roperty to the extent that it is generally exempt under nonbankruptcy law." *Id.* § 3572(2)(A)-(B). In other words, the encumbered portion of a property cannot be considered an asset. Then, the other important term in the statute in this case is "transfer," which is defined to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease or creation of a lien or other encumbrance." *Id.* § 3572(12). These terms are important to keep in mind regarding the transfer to the LLC.

### 2. The Trust Defendants.

#### a. *The Mortgage to the Frederick Trust.*

In reference to section 3575(1)(B)(2), Plaintiffs contend that the mortgage Charles Dhyse executed in favor of the Frederick Trust in early 2007 for the Stowers Property was fraudulent because Charles Dhyse, "without receiving reasonably equivalent value for the transfer[,] intended to incur debts beyond his ability to pay or reasonably believed that he would incur debts." (Pl.s' Br. 4-5.) The Court disagrees. At trial, the evidence demonstrated that Charles Dhyse's parents, in an attempt to help him out of a financial hole, loaned him (through the Frederick Trust) at least

---

Frederick Trust. (Pl.s' Br. 4-5.) They did not raise section 3576 as a basis for any of the transfers being fraudulent. The Court addresses only those positions put forth; it does not address contentions that were not raised.

11

$105,000[21] to purchase the Stowers Property from CNB at the foreclosure sale. In exchange for taking this money from the Frederick Trust, Charles Dhyse executed a mortgage on the Stowers Property for $105,000 in the Frederick Trust's favor. On its face, taking a loan of at least $105,000 in exchange for executing a mortgage of $105,000 in the loaning party's favor is a transfer for reasonably equivalent value. Plaintiffs have not proved this transfer was fraudulent by clear and convincing evidence.

### b. The Deed to the LLC.

Most fundamentally, the Court concludes that Plaintiffs have not proved by clear and convincing evidence that Charles Dhyse made a "transfer" of an "asset," as those terms are defined in the statute. At the time Charles Dhyse deeded the Stowers Property to the LLC, it was encumbered by a $105,000 mortgage and other liens (real estate tax liens, State of Maine sales tax liens, the CNB execution lien, and the Viking, Inc. write of execution) totaling $63,325.67. Therefore, the property was encumbered by valid liens totaling more than $168,000. Plaintiffs have not brought forth clear and convincing evidence to show that the value of the Stowers Property at the time Charles Dhyse deeded it to the LLC exceeded the extent to which it was encumbered by these liens. See Achille Bayart & Cie v. Crowe, 238 F.3d 44, 47 (1st Cir. 2001) ("To recover under the Maine UFTA, a plaintiff must prove that there was some determinable amount of value in the assets of the debtor over and above the amount of the secured debt."). Even if Charles Dhyse "transferred" an "asset" when he deeded the property to the LLC, he received reasonably equivalent value in return. Specifically, he was relieved of more than $168,000 worth of debt obligations in exchange for his conveying the title to the Stowers Property to the LLC, which was controlled by the Frederick Trust. Plaintiffs have not proved a fraudulent transfer of

---

[21] See the discussion in footnote 3 regarding CNB's records reflecting a $10,500 bid deposit in addition to the $105,000 paid to purchase the property.

the Stowers Property by clear and convincing evidence.

3. Alan Tetervin.

The transfer of Dhyse's one-half interest in the Boathouse Property is unique. There is no question that Dhyse executed the deed to his interest in the Boathouse Property after Plaintiffs obtained the judgment of foreclosure and shortly before Plaintiffs commenced the lawsuit on the promissory note. He received no monetary payment in return at the time he executed the deed to Tetervin in 2009. He continued some limited use of the property, though not to the extent of retaining possession or control. One or all of these could point toward an actual intent to hinder, delay, or defraud. *See* 14 M.R.S. § 3575(2)(B), (D), (H). However, the Court is not limited to considering *only* the statutorily enumerated factors and must instead consider all circumstances surrounding the transfer. *See Fed. Deposit Ins. Corp. v. Proia*, 663 A.2d 1252, 1254 (Me. 1995) ("The court may consider factors other than [those in section 3575(2)], and any combination of factors may support a determination of actual intent. *Id.* comment. *See also* U.F.T.A. § 4 comment (1984) (stating that in considering the listed factors a court should evaluate all relevant circumstances and take into account all indicia negativing as well as suggesting fraud)."). Here, there is one factor that is particularly persuasive to the Court, namely the co-tenancy agreement (that established Tetervin's right to Dhyse's one-half interest) entered into before the Powells ever met Charles Dhyse.

As the agreement between Dhyse and Tetervin stipulated, Tetervin paid the full price of the original purchase. Dhyse was to operate his Boathouse business and pay expenses to hold up his end of the bargain. Dhyse complied with his obligations under the co-tenancy agreement for a period of time when he made minimal payments of expenses and operated his business prior to 2006. As Charles Dhyse testified, however, his boat business operations ceased to be operative,

13

for all intents and purposes, around 2006 when CNB foreclosed on the Stowers Property. Thus, once Dhyse effectively defaulted on his obligation under the co-tenancy agreement by failing to conduct his business and to pay the expenses for the Boathouse Property after a certain period, Tetervin was entitled to recover Dhyse's one-half interest pursuant to the co-tenancy agreement between the two. Whether Dhyse transferred his interest in 2006 when the Boathouse business ceased to be operative, or 2009 when he actually did, or any other time in between, Tetervin was entitled to the other one-half interest in the property pursuant to his agreement with Dhyse. There was no actual intent to hinder, delay, or defraud when the transfer was made pursuant to an agreement that was entered into before the Powells ever loaned Dhyse money. Plaintiffs have not proved they are entitled to void a transfer made pursuant to a valid agreement.

## CONCLUSION

Plaintiffs have not proved any of the transfers were fraudulent by clear and convincing evidence. All defendants are entitled to judgment on Plaintiffs' Complaint, and the recovery of costs in accordance with 14 M.R.S. §§ 1501-1522 (2018) and M.R. Civ. P. 54.

The entry is:

1. Judgment for the Charles Dhyse Trust, the Frederick G. Dhyse Revocable Trust, and Temple Heights Maine LLC on Plaintiffs' Complaint for fraudulent transfer pursuant to 14 M.R.S. §§ 3571-3582.
2. Judgment for Alan Tetervin on Plaintiffs' Complaint for fraudulent transfer pursuant to 14 M.R.S. §§ 3571-3582.
3. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: 6/11/19

The Hon. Robert E. Murray
Justice, Maine Superior Court

Entered on the Docket: 6-11-19

14